IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

VELOCITY PROCUREMENT, LLC,　　§
　　　　　　　　　　　　　　　　　§
　　Plaintiff-Counterdefendant,　　§
　　　　　　　　　　　　　　　　　§
VS.　　　　　　　　　　　　　　　§　　Civil Action No. 3:25-CV-2501-D
　　　　　　　　　　　　　　　　　§
LENNOX INTERNATIONAL, INC.,　　§
　　　　　　　　　　　　　　　　　§
　　Defendant-Counterplaintiff,　　§

MEMORANDUM OPINION
AND ORDER

In this diversity action involving allegations of fraud, breach of contract, and related

claims, defendant-counterplaintiff Lennox International, Inc. ("Lennox") moves under Fed.

R. Civ. P. 12(b)(6) and 9(b) to partially dismiss the claims of plaintiff-counterdefendant

Velocity Procurement, LLC ("Velocity"), and Velocity moves to dismiss Lennox's breach

of contract counterclaim.  For the reasons that follow, the court grants Lennox's motion,

denies Velocity's motion, and grants Velocity leave to replead.

I

Velocity is a consulting firm that specializes in helping businesses cut procurement

costs by, *inter alia*, reviewing existing contracts and negotiating more advantageous contracts

with existing or new suppliers.[1]  Lennox is a manufacturer of air conditioners and other

---

[1]In deciding Lennox's Rule 12(b)(6) motion, the court construes the complaint in the light most favorable to Velocity as the nonmovant, accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in Velocity's favor. *See, e.g.*, *Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004).  In deciding Velocity's Rule 12(b)(6) motion, the court construes Lennox's counterclaims in Lennox's favor.

climate control products.

In December 2023 Lennox and Velocity began to discuss whether, and to what extent, Velocity could help Lennox save on its procurement costs. During these discussions, Lennox represented that it anticipated that Velocity could address over $250 million in total spend. Velocity alleges that it relied on this representation, first, to determine that enough money was at stake to make the project economically viable, and, second, to set rates at an amount that would ensure an adequate return on Velocity's labor and start-up costs.

Lennox and Velocity ultimately entered into a Master Services Agreement ("MSA") and a Statement of Work #2 ("SOW") (collectively, the "Agreement," unless otherwise indicated) that contain the agreed-upon terms and conditions of the parties' relationship.[2] Relevant to Velocity's claims, the MSA contains in ¶ 8 a "No Volume Commitment" that states that "Lennox may provide estimated volume or project duration for planning purposes only. Lennox does not commit to any volume or project duration." D. App. (ECF No. 23-1) at 4.

The parties' fee structure is set out in the SOW. Section 1.2.1 provides that Lennox and Velocity "identified a minimum of approximately $250 Million in addressable/source-able spend, which is detailed in Table 1." *Id.* at 13. Under § 4.3.1, Velocity's fee (referred

---

[2]The court is permitted to consider these documents, which are "attached to the motion to dismiss" and "central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

to as a "gainshare") is set at 25% of the Savings[3] Lennox obtains "during the first 12-month period of [a] new contract" that results from Velocity's services. *Id*. at 17.  In addition, § 4.3.1 provides that "[f]or the first twelve (12) months, for each $5 Million the annual addressable spend is lower than the originally determined annual addressable spend of $250 million dollars, the Consultant Fee will increase by 0.25%, to be applied retroactively." *Id*.

Initially, Lennox paid Velocity its contracted-for fee for all of its completed projects. Eventually, however, Lennox chose not to pay for several projects.  In addition, despite having represented that Velocity would be able to address $250 million in total spend, Lennox only provided Velocity with $42,447,996 of addressable spend.[4]  Velocity maintains that, if Lennox had provided $250 million in addressable spend, Velocity would have earned a gainshare fee of at least $12,588,600—an amount far in excess of the amount Lennox actually paid.

---

[3]The SOW defines "Savings" as:

> the net reduction in unit cost(s) from the Baseline established in the Sourcing Project Charter multiplied by forecasted usage plus reduction of any taxes, surcharges, and/or fees.  The definition of Savings also includes without limitation, increased rebates, discount improvements, credits, refunds, other incentives, and payment terms savings (using 8% cost of capital), and discontinued use of unused and/or unneeded products or services identified by Consultant.

D. App. (ECF No. 23-1) at 17.

[4]Lennox maintains that, pursuant to § 4.3.1 of the SOW, it paid Velocity a gainshare of 35.25% (not 25%) for those projects through which Velocity caused Lennox to achieve recognized savings.

Velocity then filed this lawsuit against Lennox.  In its first amended complaint, which is the operative pleading, Velocity alleges claims for breach of contract based on non-payment of amounts owed, breach of contract based on failure to provide adequate total spend, and fraud.

Lennox counterclaims against Velocity for breach of contract, money had and received, and unjust enrichment.  In support of its breach of contract counterclaim, Lennox alleges that Velocity violated the confidentiality provision in the MSA[5] by filing on the public docket a complaint that disclosed Lennox's confidential information, including, *inter alia*, specific dollar figure information relating to Lennox's spend on its pharmacy benefits manager, pallets, non-IT temporary labor, and welding and brazing services.

Lennox moves to dismiss Velocity's claims for fraud and for breach of contract relating to the $250 million in addressable spend.  Velocity moves to dismiss Lennox's breach of contract counterclaim.  Both motions are opposed, and the court is deciding them on the briefs, without oral argument.

II

The court first considers Lennox's motion to dismiss, which requires the court to decide whether Velocity has plausibly alleged its claims for fraud and breach of contract

---

[5]In ¶ 15, the MSA provides that "[e]ach party will treat as confidential all information disclosed by the other party ('Discloser') at the time of disclosure ('Confidential Information')," and that "Recipient will protect Confidential Information from disclosure to others, using the same degree of care used to protect its own confidential information, but in no event less than a reasonable standard of care."  D. App. (ECF No. 23-1) at 8.

based on failure to provide adequate total spend.

A

"In deciding a Rule 12(b)(6) motion to dismiss, the court evaluates the sufficiency of [the amended] complaint by 'accept[ing] all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Bramlett v. Med. Protective Co. of Fort Wayne, Ind.*, 855 F.Supp.2d 615, 618 (N.D. Tex. 2012) (Fitzwater, C.J.) (second alteration in original) (internal quotation marks omitted) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)).  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (alteration omitted) (quoting Rule 8(a)(2)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678.

- 5 -

B

Because the amended complaint alleges a fraud claim, Velocity must plead the elements of this claim with the heightened particularity required by Rule 9(b). *See, e.g.*, *Coates v. Heartland Wireless Commc'ns, Inc.*, 26 F.Supp.2d 910, 914 (N.D. Tex. 1998) (Fitzwater, J.). "Rule 9(b) imposes a heightened pleading standard for fraud claims and requires that a party state with particularity facts supporting each element of fraud." *Turner v. AmericaHomeKey Inc.*, 2011 WL 3606688, at *2 (N.D. Tex. Aug. 16, 2011) (Fitzwater, C.J.) (citing *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003)), *aff'd*, 514 Fed. Appx. 513 (5th Cir. 2013). "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Turner*, 2011 WL 3606688, at *2 (quoting *Benchmark Elecs.*, 343 F.3d at 724). More colloquially, the plaintiff must plead the "who, what, when, where, and how" of the fraud. *United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). Because Rule 9(b) must be "read in conjunction with [Rule] 8 which requires only a short and plain statement of the claim showing that the pleader is entitled to relief," "punctilious pleading detail" is not required. *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 273 (N.D. Tex. 1990) (Fitzwater, J.) (internal quotation marks omitted) (quoting *Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 892 F.2d 1238, 1264 (5th Cir. 1990)). "The court's key concern in assessing a complaint under Rule 9(b) is to determine whether the plaintiff seeks

to redress specific wrongs or whether the plaintiff instead seeks the opportunity to search out actionable wrongs." *Garcia v. Boyar & Miller, P.C.*, 2007 WL 2428572, at *4 (N.D. Tex. Aug. 28, 2007) (Fitzwater, J.) (citation omitted).

## III

The court begins with Lennox's motion to dismiss Velocity's breach of contract claim, which is based in part on the allegation that "Lennox represented in its contract with Velocity that Lennox would provide at least $250 million in addressable spend." Am. Compl. ¶ 18. Lennox contends that this claim fails as a matter of law because Velocity has not identified, and cannot identify, any term in the Agreement that required Lennox to provide Velocity with at least $250 million in addressable spend and, in fact, the Agreement states the opposite.

## A

Under Texas law,[6]

> the court's primary concern when interpreting a contract is to ascertain the parties' intentions as expressed objectively in the contract. In doing so, the court must examine and consider the entire writing in an effort to harmonize and give effect to all contractual provisions, so that none will be rendered meaningless. Language should be given its plain and grammatical meaning unless it definitely appears that the parties' intention would thereby be defeated. Where the contract can be given a definite legal meaning or interpretation, it is not ambiguous, and the court will construe it as a matter of law.

---

[6]The MSA states that "[t]he laws of the State of Texas will govern this Agreement." D. App. (ECF No. 23-1) at 9.

*Klein v. Fed. Ins. Co.*, 220 F.Supp.3d 747, 756 (N.D. Tex. 2016) (Fitzwater, J.) (citations omitted), *aff'd*, 714 Fed. Appx. 441 (5th Cir. 2018).

The MSA provides, in clear and unambiguous terms, that "Lennox may provide estimated volume or project duration *for planning purposes only. Lennox does not commit to any volume* or project duration." D. App. (ECF No. 23-1) at 4 (emphasis added). Velocity has failed to point to any provision in the Agreement that would contractually obligate Lennox to provide Velocity with any set amount in addressable spend.

B

Velocity argues in its response that § 1.2.1 of the SOW contradicts the "No Volume Commitment" provision of the MSA, and that because the SOW provides that its terms "shall take precedence and control over the Agreement," D. App. (ECF No. 23-1) at 20, "[t]his means that Lennox cannot hide behind the MSA to defeat the SOW," P. Br. (ECF No. 27) at 4. Velocity's argument, however, is misplaced because § 1.2.1 does not contradict the clear and unambiguous "No Volume Commitment" provision of the MSA.

The SOW provides that it "is entered into . . . pursuant to the terms and conditions of the [MSA]" and that, upon execution, it "shall automatically append to and be governed by the terms and conditions of the [MSA]." D. App. (ECF No. 23-1) at 13. Under Texas law, when interpreting a contract, the court must "examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless.'" *AEP Tex. Cent. Co. v. Arredondo*, 612 S.W.3d 289, 296 (Tex. 2020) (quoting *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999)). Section 1.2.1

can easily be harmonized with ¶ 8 of the MSA if it is interpreted as providing an estimate only.    Section 1.2.1 states that, "[b]ased on the recent spend analysis, [Velocity] and [Lennox] identified a minimum of approximately $250 Million in addressable/source-able spend, which is detailed in Table 1." D. App. (ECF No. 23-1) at 13.  Section 1.2.1 does not impose on Lennox a contractual obligation to *provide* Velocity with the addressable spend it has identified; it simply sets out an estimate that the MSA contemplates, "for planning purposes only." *Id*. at 4.  As Lennox points out in its reply, § 1.2.1 does not, for example, state that "Lennox *shall provide* Velocity with at least $250 million in addressable spend." D. Reply (ECF No. 28) at 3 (emphasis added).

This reading of § 1.2.1—i.e., that it provides an estimate of addressable spend, not a promise to provide $250 million in addressable spend—is also borne out when considered in connection with the SOW's fee provisions.  As set out above, § 4.3.1 clearly contemplates that Lennox *may not* provide Velocity with $250 million in addressable spend, and provides for a retroactive fee increase if this occurs:

> [f]or the first twelve (12) months, for each $5 Million the annual addressable spend is lower than the originally determined annual addressable spend of $250 million dollars, the Consultant Fee will increase by 0.25%, to be applied retroactively.    The additional amount will be added on the next invoice.

D. App. (ECF No. 23-1) at 17.  As Lennox points out, this language plainly shows that the parties "understood that the reference to 'approximately $250 million' in addressable spend was an estimate because the parties agreed to a sliding-scale formula for increasing Velocity's gainshare fee percentage if the estimate is not met." D. Reply (ECF No. 28) at

- 9 -

4.   If Lennox was contractually *required* to provide Velocity with $250 million in addressable spend, there would be no reason to include the retroactive fee increase.  In other words, Velocity's interpretation of the Agreement renders this portion of § 4.3.1 meaningless, which is counter to the Texas rule that the court must give effect to all provisions of a contract so that none will be meaningless.  *See AEP Tex. Cent. Co.*, 612 S.W.3d at 296 (quoting *MCI Telecomms. Corp.*, 995 S.W.2d at 652).

Velocity contends that the "fee-increase provision recognizes that Lennox might breach the minimum addressable spend requirement and sets up a mechanism for dealing with that breach."  P. Br. (ECF No. 27) at 5.  But nothing in § 4.3.1 indicates that the fee-increase provision is intended to provide a remedy for breach of the Agreement.  As Lennox points out in its reply,

> the gainshare formula is not contained in the MSA Paragraph 6 addressing Velocity's remedies, which include interest and suspension of performance.  Nor is the gainshare formula in the Agreement's Dispute Resolution provision (MSA ¶ 17), Cumulative Remedies provision (MSA ¶ 21), or Limitations on Liability provision (MSA ¶ 24).  Rather, the gainshare formula is in the "Fees" provision, which sets forth how Velocity's fees will be calculated under a variety of contemplated scenarios.

D. Br. (ECF No. 28) at 4 (citations omitted).

Accordingly, because Velocity has failed to plausibly allege that the Agreement contained "a requirement setting the 'minimum' addressable spend that Lennox would allow Velocity to work on," P. Br. (ECF No. 27) at 8-9, the court grants Lennox's motion to dismiss Velocity's breach of contract claim based on Lennox's failure to provide at least

$250 million in addressable spend.

IV

The court next turns to Velocity's fraud claim,[7] which Lennox moves to dismiss under Rules 12(b)(6) and 9(b).

A

In support of its fraud claim, Velocity alleges that Lennox falsely represented the amount of total addressable spend in (1) oral and emailed statements by Robert DiFulgentiz, Ryan Dodson, and Rich Flinchbaugh during negotiations from February 2024 until April 2024, and (2) in the Agreement; that "[u]pon information and belief, these persons made these representations with knowledge of their falsity because they were all aware that Lennox did not have and would not have $250 million in addressable spend, but represented so in order to trick Velocity into setting a lower gainshare fee and hiring more workers for the project"; and that Velocity relied on these representations by entering into the Agreement, setting the rates used in the parties' contract, and "gearing-up for a project that Velocity

---

[7]The elements of common law fraud in Texas are:

> (1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result.

*Choe v. Bank of Am., N.A.*, 2013 WL 3196571, at *5 (N.D. Tex. June 25, 2013) (Fitzwater, C.J.) (quoting *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 858 (5th Cir. 2004)), *aff'd*, 605 Fed. Appx. 316 (5th Cir. 2015).

believed would be far larger than it actually was." Am. Compl. ¶ 19.

B

To the extent that Velocity bases its fraud claim on the statement in § 1.2.1 of the SOW that, "[b]ased on the recent spend analysis, Consultant [(Velocity)] and Client [(Lennox)] identified a minimum of approximately $250 Million in addressable/source-able spend," D. App. (ECF No. 23-1) at 13, Velocity has not plausibly alleged that this statement is false. And, as Lennox points out, Velocity cannot have been defrauded by its *own* estimate and representation. Moreover, the court has already held that the Agreement does not contain a promise that Lennox would provide $250 million in addressable spend; the addressable spend identified in § 1.2.1 of the SOW is an estimate to be used for planning purposes only. *See supra* § III(B).

C

To the extent that Velocity bases its fraud claim on "oral and emailed statements by Robert DiFulgentiz, Ryan Dodson, and Rich Flinchbaugh during negotiations . . . the week of February 5, 2024 and extending through April 2024[,]" Am. Compl. ¶ 19, the court holds, as a preliminary matter, that Velocity has failed to plead its fraud claim with the specificity that Rule 9(b) requires. Velocity does not allege what was said in the "oral and emailed statements," or plausibly allege that the representations therein were false. *See, e.g.*, *Kougl v. Xspedius Mgmt. Co. of Dall./Ft. Wor., L.L.C.*, 2005 WL 1421446, at *5 (N.D. Tex. June 1, 2005) (Fitzwater, J.) (dismissing fraud claim under Rule 9(b) where, *inter alia*, "plaintiffs do not even allege the content of some of the allegedly-fraudulent statements.")

- 12 -

But even assuming *arguendo* that Velocity has plausibly alleged that Lennox falsely represented, in oral and emailed statements made from February 2024 until April 2024, that Velocity "would be able to address $250,000,000 in addressable spend,"[8] Am. Compl. ¶ 16, Velocity has not plausibly pleaded that it reasonably relied on these extra-contractual statements.[9]

"Texas courts have repeatedly held [that] a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 424 (Tex. 2015) (citation omitted); *see also Roxo Energy Co. v. Baxsto, LLC*, 713 S.W.3d 404, 409 (Tex. 2025) ("[R]eliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law." (alteration in original) (quoting *JPMorgan Chase Bank, N.A. v. Orca Assets G.P.,*

---

[8]To the extent that Velocity intends to rely on oral and emailed statements that contain a promise of future performance, "under Texas law, a promise of future performance constitutes actionable fraud only if 'the promise was made with no intention of performing at the time it was made.'" *Herrmann Holdings Ltd. v. Lucent Techs. Inc*., 302 F.3d 552, 564 (5th Cir. 2002) (quoting *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc*., 960 S.W.2d 41, 48 (Tex. 1998)); *see also Fluorine on Call, Ltd.*, 380 F.3d at 858. Velocity's conclusory allegation that "they were all aware that Lennox did not have and would not have $250 million in addressable spend," Am. Compl. ¶ 19, is insufficient to plausibly allege that any particular speaker, at the time he made the allegedly fraudulent statement, lacked the intent to provide Velocity with $250 million in addressable spend.

[9]Velocity alleges in its amended complaint that it relied on Lennox's statements "by entering into its contract with Lennox at all, setting the rates used in the parties' contract, and gearing-up for a project that Velocity believed would be far larger than it actually was." Am. Compl. ¶ 19. Because the "oral and emailed statements" post-date the MSA, Velocity cannot plausibly plead that it relied on these statements when it agreed to the MSA.

*L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018))).    "A contract sufficiently contradicts an extra-contractual representation if the 'meaning of [the] contract conflict[s] with the earlier representation such that a reasonable person could not read the agreement and still plausibly claim to believe the earlier representation.'" *Id.* (internal quotation marks omitted) (quoting *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 498 (Tex. 2019)).

Velocity contends in its response that it "was justified in relying on representations made by Lennox when those misrepresentations were incorporated into an agreement [(i.e., the SOW)] that controls over the MSA." P. Br. (ECF No. 27) at 5.  But this argument suffers from at least two shortcomings: First, Velocity has not plausibly pleaded that any extra-contractual representation that Lennox would provide Velocity with $250 million in addressable spend *was* incorporated into the SOW.  As explained above, § 1.2.1 of the SOW, particularly when read in the context of the Agreement's other provisions (i.e., the "No Volume Commitment" provision in the MSA and the "Fees" provision in § 4.3.1 of the SOW), does not *guarantee* that Lennox will provide Velocity with at least $250 million in addressable spend.  *See supra* § III(B).  Second, the MSA expressly states, in clear and unambiguous terms, that "Lennox does not commit to any volume." D. App. (ECF No. 23-1) at 4.  The SOW, which was signed on April 9, 2024,[10] provides that it "shall automatically append to and be governed by the terms and conditions of the [MSA]." *Id*. at 13.  The SOW cannot be read in isolation.  It is governed by the MSA, which clearly and unambiguously

---

[10]Velocity alleges that the oral and emailed statements were made "during negotiations," Am. Compl. ¶ 19, i.e., before the SOW was signed.

states that "Lennox does not commit to any volume," *Id.* at 4.  As a matter of law, Velocity

cannot have reasonably relied on any representation to the contrary.

Because Velocity has failed to plead its fraud claim with the specificity Rule 9(b)

requires and, in light of the Agreement, cannot, as a matter of law, plausibly plead the

essential element of reasonable reliance, the court grants Lennox's motion to dismiss

Velocity's fraud claim.

V

In its response to Lennox's motion, Velocity requests leave to replead.  The court

grants this request.  *See In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567-68

(N.D. Tex. 2005) (Fitzwater, J.) ("[D]istrict courts often afford plaintiffs at least one

opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the

defects are incurable or the plaintiffs advise the court that they are unwilling or unable to

amend in a manner that will avoid dismissal." (quoting *Great Plains Tr. Co. v. Morgan

Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002))).  There is no indication that

Velocity cannot, or is unwilling to, cure the defects in its amended complaint.  And, as noted,

Velocity expressly requests leave to amend if its amended complaint is deemed deficient.

The court therefore grants Velocity 28 days from the date this memorandum opinion and

order is filed to file a second amended complaint.

VI

The court now turns to Velocity's motion to dismiss Lennox's breach of contract counterclaim.

A

Lennox alleges that, in breach of ¶ 15 of the MSA, Velocity filed on the public docket a complaint disclosing Lennox's confidential information, including, without limitation, specific dollar figure information relating to Lennox's spend on its pharmacy benefits manager, pallets, non-IT temporary labor, and welding and brazing services ("Disclosed Confidential Information"); that the complaint containing the Disclosed Confidential Information remained on the public docket for weeks; and that "for many weeks, members of the public could access and review the Disclosed Confidential Information." Countercl. ¶ 17.

Velocity moves to dismiss Lennox's breach of contract counterclaim on the ground that Lennox has failed to plausibly plead that it has been harmed by Velocity's breach because "Lennox does not allege that anyone accessed—or even knew of—this filing during the time it was public . . . . Lennox generally says Velocity 'caused Lennox harm' without identifying any actual harm at all." P. Br. (ECF No. 26) at 2.

Lennox responds that it has alleged that it is entitled to recover nominal damages. *See* Countercl. ¶ 21 ("Velocity's breach of Paragraph 15 of the Agreement caused Lennox harm. At a minimum, Lennox is entitled to recover nominal damages."). Lennox also maintains that Velocity's motion is frivolous and that the court, not only should deny the motion, but

should also award Lennox its reasonable attorney's fees incurred in drafting its opposition.

Velocity replies that, under Texas law, the rule in recent decades has been that nominal damages are *not* available when the harm is entirely economic and subject to proof; that Lennox alleges a theory of breach that would cause purely economic harm but fails to allege that such harm actually occurred; and that "[i]n so doing, Lennox pleaded itself out of nominal damages without pleading itself into actual damages."  P. Reply (ECF No. 36) at 3.

B

Lennox is correct that Texas law permits the recovery of nominal damages for breach of contract.  *See MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 664-65 (Tex. 2009) ("[N]ominal damages may be recovered for breach of contract.").  But "nominal damages are not for compensation; they are for cases in which there are no damages, or none that could ever be proved."  *Id.* at 665 (citation omitted).  "While a few older cases hold otherwise, in recent decades the rule in Texas has been that nominal damages are not available when the harm is entirely economic and subject to proof (as opposed to non-economic harm to civil or property rights)."  *Id.* (footnotes omitted) (citing cases).  "It is the plaintiff's burden to establish, through pleading and proof, that the case is one in which nominal damages are appropriate."  *Loeb-Defever v. Strategic Constr., Ltd.*, 2022 WL 2757576, at *5 (S.D. Tex. July 14, 2022) (citing cases), *aff'd sub nom. Loeb-Defever v. Mako, L.L.C.*, 2023 WL 5611042 (5th Cir. Aug. 30, 2023); *see also Chehab v. First Serv. Credit Union*, 2020 WL 5241060, at *5 (Tex. App. Sept. 3, 2020, no pet.) (mem. op.)

- 17 -

("Chehab has not pleaded for nominal damages for non-economic harm, such as harm to civil or property rights.  Therefore, the fact that nominal damages can generally be recovered in a breach-of-contract action does not create a fact issue as to whether Chehab produced evidence of actual damages.").

Lennox alleges that Velocity breached the MSA by disclosing its proprietary confidential information.  Although a breach of this type *could* result in economic harm, Lennox's conclusory allegation that "Velocity's breach of Paragraph 15 of the Agreement caused Lennox harm," Countercl. ¶ 21, is insufficient.  Nevertheless, Lennox may still be able to recover nominal damages if it establishes non-economic harm, "such as harm to civil or property rights."  *Chehab*, 2020 WL 5241060, at *5; *see, e.g.*, *Lomix Ltd. P'ship v. Compass Bank*, 2019 WL 9698534, at *4 (S.D. Tex. Feb. 28, 2019) ("According to Plaintiffs, they contracted to protect their privacy, and Compass Bank allegedly breached this contractual protection.  Damages flowing from this alleged breach can be inherently non-economic.  Thus, [Plaintiffs] can seek nominal damages for such non-economic harm." (citations omitted)); *Versata Software, Inc. v. Internet Brands, Inc.*, 2012 WL 3075167, at *2 (E.D. Tex. July 30, 2012) ("Here, the jury could have found that Versata's disclosure of Autodata's confidential information in violation of the confidentiality agreements constituted a legal injury to Autodata.  There was, however, no substantial monetary loss to be compensated because that information was never used by Versata—or anyone else—to gain a competitive advantage over Autodata. . . . Therefore Autodata was entitled to ask for nominal damages with respect to its breach of contract claim, even though it had suffered no

actual economic loss from the disclosure.").

Lennox's allegation that Velocity interfered with and harmed its intellectual property, causing damages that at least one court has described as "inherently non-economic," *Lomix Limited Partnership*, 2019 WL 9698534, at *4, is sufficient at the pleading stage to support its breach of contract counterclaim and request for nominal damages.[11]

Velocity does not move to dismiss Lennox's breach of contract counterclaim on any other ground. Accordingly, the court denies Velocity's motion to dismiss.

C

The court also denies Lennox's request for attorney's fees based on the court's inherent authority.

A district court "should invoke its inherent power to award attorney's fees only when it finds that fraud has been practiced upon it, or that the very temple of justice has been defiled." *F.D.I.C. v. Maxxim, Inc.*, 523 F.3d 566, 590 (5th Cir. 2008) (internal quotation marks omitted) (quoting *Boland Marine & Mfg. Co. v. Rihner*, 41 F.3d 997, 1005 (5th Cir. 1995)). Moreover, before imposing sanctions under such circumstances, the court must make a specific finding of bad faith by the party against whom sanctions are sought. *Kennard Law P.C. v. United Airlines, Inc.*, 2024 WL 3717272, at *4 (5th Cir. 2024). "Bad faith exists when a party knowingly or recklessly raises a frivolous argument or argues a meritorious claim for the purpose of harassing an opponent." *Id.* (citations omitted) "Bad faith implies

---

[11]Of course, it will be Lennox's burden at trial to prove "that the case is one in which nominal damages are appropriate." *Loeb-Defever*, 2022 WL 2757576, at *5 .

- 19 -

that a litigant intentionally took a position he subjectively knew was unfounded." *Gate Guard Servs., L.P. v. Perez*, 792 F.3d 554, 561 n.4 (5th Cir. 2015). Bad faith also requires the litigant's position to be objectively frivolous. *Id.*

The court is unable to find that Velocity's motion to dismiss is so lacking in merit as to be objectively frivolous. Lennox maintains that "[g]iven the decades of binding precedent defeating Velocity's sole argument for dismissal, the only reasonable conclusion is that Velocity knowingly or recklessly asserted a frivolous position with the hope of increasing Lennox's litigation costs." D. Br. (ECF No. 33) at 9. But Lennox's speculative contention effectively overlooks authority from the Supreme Court of Texas that "nominal damages are *not* available when the harm is entirely economic and subject to proof," *MBM Financial Corp.*, 292 S.W.3d at 665 (emphasis added), and Lennox's own allegation that "the secrecy of the Disclosed Confidential Information *had independent economic value* to Lennox," Countercl. ¶ 14 (emphasis added). Velocity had at least a colorable argument that Lennox failed to plausibly allege non-economic harm that would support an award of nominal damages. And Lennox has failed to demonstrate that Velocity pursued its motion in bad faith or with malicious intent. Lennox is relegated to reliance on the conclusory assertion that Velocity filed its motion for the sole purpose of increasing Lennox's litigation costs. Accordingly, the court declines to award attorney's fees under its inherent authority.

* * *

For the reasons explained, the court grants Lennox's motion to dismiss Velocity's breach of contract claim based on Lennox's failure to provide at least $250 million in addressable spend; grants Lennox's motion to dismiss Velocity's fraud claim; denies Velocity's motion to dismiss Lennox's breach of contract counterclaim; and grants Velocity leave to file an amended complaint within 28 days of the date this memorandum opinion and order is filed.

**SO ORDERED**.

June 5, 2026.

_____
SIDNEY A. FITZWATER
SENIOR JUDGE

- 21 -